**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**UNITED STATES OF AMERICA,**

**v.**                                                                 **Case No. 8:18-cr-100-T-33AAS**

**ANTHONY W. KNIGHTS**

_____/

### AMENDED REPORT AND RECOMMENDATION
**(amended as to exhibit citations only)[1]**

Anthony Knights moves to suppress all evidence and statements law enforcement obtained during a search. (Doc. 28). The government objects. (Doc. 34). The undersigned concludes, based on the totality of the circumstances, law enforcement seized Mr. Knights without reasonable suspicion. Further, the undersigned concludes the evidence and statements the officers obtained are fruit of the unlawful search. Therefore, the undersigned recommends Mr. Knights's motion to suppress should be **GRANTED**.

---

[1] This Amended Report and Recommendation is substantively identical to the previous Report and Recommendation (Doc. 51). This Amended Report and Recommendation, however, amends and replaces the prior Report and Recommendation to reflect more accurate citations to the parties' exhibits. (Docs. 52, 53). Consequently, the parties have fourteen days from the date of this Amended Report and Recommendation to object under 28 U.S.C. Section 636(b)(1).

I.    **FACTUAL FINDINGS**[2]

Around 1:00 a.m. on January 26, 2018, Officers Seligman and Samuel[3] patrolled a high-crime residential area in Tampa, Florida, in a marked police vehicle. Officer Seligman drove and Officer Samuel sat in the passenger seat.  Both officers wore their uniforms and carried their service-issued handgun.  The officers knew the residential area recently experienced high crime and gang activity because they previously responded to multiple shootings and narcotics crimes in the area.

While they patrolled, the officers drove past a dark blue Oldsmobile parked next to the street in a residence's front yard.  The Oldsmobile was parallel-parked between a wooden white fence located in front of the residence and the street.  The driver's side of the Oldsmobile was closer to the street and the passenger's side closer to the fence.  Enough space existed for someone to open the driver-side door without going onto the street and enough space existed to open the passenger-side door without hitting the fence. (Doc. 52, Gov't Ex. 1–7).  Behind the Oldsmobile was the residence's stand-alone mailbox and a city-issued garbage receptacle, and in front of the Oldsmobile was a neighbor's stand-alone mailbox.  (Doc. 52-1, Gov't Ex. 1). Towering over the neighbor's mailbox and directly in front of the Oldsmobile was a large, overgrown shrub, part of which nearly touched the front of the parked

---

[2]  These facts, construed in a light more favorable to the government, were elicited at an evidentiary hearing held before the undersigned.

[3]  Officers Seligman and Samuel work for Tampa Police Department.

Oldsmobile.  (Doc. 52-1, Gov't Ex. 1; Doc. 52-5, Gov't Ex. 5; Doc. 53-4, Def.'s Ex. 10).

Officers Seligman and Samuel saw one man, later identified as Mr. Knights, leaning into the open driver-side door and another man, later identified as Hozell Keaton, leaning into the open passenger-side door.  Believing Messrs. Knights and Keaton might be burglarizing the car, the officers drove past the Oldsmobile to get a better look.  When the officers passed, Messrs. Knights and Keaton gave the officers a "blank stare."  After they passed the Oldsmobile, the officers heard someone try to start the car, but the engine would not start.  The officers then turned the patrol car around to investigate further.

Officer Seligman parked the patrol car on the side of the street immediately next to the Oldsmobile and facing the direction of (and blocking) oncoming traffic, though there is no evidence that any traffic approached during the encounter.  The patrol car was parked facing the opposite direction that the Oldsmobile faced and the two cars were trunk-to-trunk; the trunk of the patrol car was parallel with the Oldsmobile's trunk.  Mr. Knights was by the driver's side next to the patrol car. Officer Seligman flashed his flashlight on Mr. Knights while he parked the patrol car.

Before Officer Seligman parked the patrol car, Mr. Keaton walked away from the Oldsmobile, through the gate in the wooden fence, and toward the house.  Officer Samuel got out of the patrol car, walked toward Mr. Keaton, and tried to get his attention to speak with him.  But Mr. Keaton was already close to the residence's front door by the time Officer Samuel got out of the patrol car.  So, Officer Samuel

3

was unable to get Mr. Keaton to speak with him before Mr. Keaton walked into the house.  Officer Samuel then walked back toward the Oldsmobile.

While Officer Samuel tried to speak with Mr. Keaton, Mr. Knights sat in the driver's seat of the Oldsmobile and closed the door.  Officer Seligman got out of the patrol car and approached Mr. Knights in the Oldsmobile.  At this point, two uniformed officers wearing service-issued handguns stood in close proximity to, and approached, Mr. Knights in the Oldsmobile.  Officer Seligman knocked on Mr. Knights's window.  Mr. Knights opened his door and, immediately, Officer Seligman smelled a distinct burnt marijuana odor coming from the car.

After he smelled the marijuana, Officer Seligman asked Mr. Knights if he owned the Oldsmobile.  Mr. Knights said the car belonged to him and his wife.  During this exchange, Mr. Knights gave Officer Seligman his driver's license.  Mr. Knights testified he also gave his vehicle registration to Officer Seligman, but the officers could not confirm that in their testimony.  Officer Seligman also asked Mr. Knights if he had any marijuana.  Mr. Knights replied, "I'll be honest with you. It's all gone."  At this point, Officer Seligman began a narcotics investigation.

Officer Seligman had Mr. Knights step out of the Oldsmobile, moved him toward the back of the car, and had him place his hands on top of the car.  Officer Seligman searched Mr. Knights and found a pill bottle inside one of his pockets.  During this time, Corporal McKendree[4] arrived on scene.  Officer Seligman handed

---

[4]  Corporal McKendree also works for Tampa Police Department.

the pill bottle to Corporal McKendree, who found three different types of pills inside the bottle.  Officer Seligman then arrested Mr. Knights and placed him in the back seat of his patrol car.  Mr. Knights told Officer Seligman he had a prescription for the pills, which was located in a backpack in the backseat of the Oldsmobile.

After placing Mr. Knights in the patrol car, Officer Seligman began to search the Oldsmobile while Officer Samuel stood next to the Oldsmobile.  Officer Seligman first searched the backseat of the Oldsmobile for the backpack.  Officer Seligman located the backpack and, inside, found medical documents, a firearm cartridge, and a ski mask.  Officer Seligman also saw a scale in the backseat.  While Officer Seligman searched the Oldsmobile, Officer Samuel ran a search of Mr. Knights's driver's license to determine if Mr. Knights and his wife owned the Oldsmobile.  The officers eventually learned the Oldsmobile belonged to Mr. Knights's wife.

Officer Seligman then searched the front of the Oldsmobile, where he found a handgun between the driver's seat and center console.  Officer Seligman saw smoked marijuana in the ashtray and marijuana residue in different parts of the car, including the floorboard.

After Officer Seligman performed his search, Officer Samuel searched the trunk of the Oldsmobile to determine if other items were in the car.  Officer Samuel found a rifle and a firearm cartridge in the trunk.  Officer Seligman read *Miranda* warnings to Mr. Knights, who then agreed to be interviewed and gave Officer Seligman a statement.  In his statement, Mr. Knights admitted the handgun Officer

Seligman found in the front of the Oldsmobile belonged to him.

A federal grand jury indicted Mr. Knights on one count of felon in possession of a firearm in violation of 18 U.S.C. Sections 922(g)(1) and 924(a)(2). (Doc. 1). Agents from the Federal Bureau of Investigation then arrested Mr. Knights. (Doc. 8). The court arraigned Mr. Knights and later released him on bond. (Docs. 4, 9). Mr. Knights then submitted this motion to suppress. (Doc. 28).

## II.   ANALYSIS

Mr. Knights argues evidence Officers Seligman and Samuel obtained should be suppressed because the officers seized Mr. Knights without reasonable suspicion in violation of the Fourth Amendment. (Doc. 28, pp. 5–18). Because Officers Seligman and Samuel detained him without reasonable suspicion, Mr. Knights argues the evidence obtained were fruits of an unlawful search. (*Id.* at 18–19).

The government claims the interaction between Officers Seligman and Samuel and Mr. Knights began as a consensual police-citizen encounter. (Doc. 34, pp. 8–12). According to the government, reasonable suspicion arose when Officer Seligman smelled marijuana coming from the Oldsmobile. (*Id.*). Alternatively, the government claims Officers Seligman and Samuel had reasonable suspicion to stop Mr. Knights before they parked next to the Oldsmobile. (*Id.* at 12-16). Either way, the government concludes that evidence obtained need not be suppressed because the officers found the evidence during a lawful seizure. (*Id.* at 16–18).

The undersigned will address each side's contentions in turn.

6

### A.   Officers Seligman and Samuel Seized Mr. Knights When They Parked Next to the Oldsmobile and Blocked In Mr. Knights's Vehicle

Mr. Knights claims Officers Seligman and Samuel seized him when they parked the patrol car next to the Oldsmobile.  (Doc. 28, p. 10).  Mr. Knights argues the patrol car's position next to, and slightly behind, the Oldsmobile blocked the car "so [Mr. Knights] could not drive forward (through the mailbox, tree, and fence), and could not drive in reverse (through the other mailbox, garbage receptacle, and the police cruiser)."  (Doc. 28, p. 11).  According to Mr. Knights, a reasonable person in his situation would not feel free to leave and disregard the officers after the patrol car parked in this manner alongside the Oldsmobile.  (*Id.*).

Mr. Knights also argues a reasonable person would not feel free to leave after Officer Samuel tried to speak with Mr. Keaton and then both officers approached Mr. Knights in the Oldsmobile.  (*Id.*).  Mr. Knights describes the scene in his motion to suppress in the following way: "Two police officers in uniforms with guns blocked Mr. Knights's path with their car, and then exited the vehicle, seemed to attempt to seize his companion, and then approached him and accused him of committing a crime." (*Id.*).  Mr. Knights claims the officers' position between the patrol car and the Oldsmobile when Officer Seligman spoke to Mr. Knights further illustrates that a reasonable person would not feel free to terminate the encounter with the officers. (*Id.* at 11–12).  Alternatively, Mr. Knights argues the officers seized him when he gave them his driver's license.  (*Id.* at 12).

7

The government argues Officers Seligman and Samuel began a consensual police-citizen encounter when they parked next to the Oldsmobile. (Doc. 34, p. 8). The government claims the officers approached Mr. Knights to determine whether they observed a crime in progress when the officers drove past the Oldsmobile in the patrol car. (*Id.*). According to the government, the patrol car did not block in the Oldsmobile and a reasonable person would have felt free to drive away. (*Id.* at 10). The government also claims Mr. Knights could have walked away from the officers, like Mr. Keaton, and a reasonable person would have felt free to do so. (Doc. 34, p. 10). Instead, the government argues the officers seized Mr. Knights after Officer Seligman smelled marijuana coming from the Oldsmobile, and that marijuana odor established reasonable suspicion to detain Mr. Knights. (*Id.* at 11–12).

The Fourth Amendment protects individuals from unreasonable search and seizure. U.S. Const. amend. IV. Not every police-citizen encounter results in a seizure under the Fourth Amendment. *Florida v. Bostick*, 501 U.S. 429, 434 (1991). Instead, three categories of police-citizen encounters exist: (1) police-citizen exchanges that involve no coercion or detention; (2) brief seizures or investigatory detentions (*Terry* stops); and (3) full scale arrests. *United States v. Perez*, 443 F.3d 772, 777 (11th Cir. 2006) (citation omitted). A police-citizen encounter does not trigger Fourth Amendment scrutiny until the interaction loses its consensual nature. *Bostick*, 501 U.S. at 434. A police officer need not have reasonable suspicion of criminal activity to begin a consensual police-citizen encounter. *Id.*

8

A police-citizen encounter is consensual as long as a reasonable person would feel free to disregard the police officer and "go about his business." *Id.*; *California v. Hodari D.*, 499 U.S. 621, 628 (1991) (citation omitted). The "simple act" of a police officer asking questions to a citizen is not a seizure under the Fourth Amendment. *Perez*, 443 F.3d at 778 (citation omitted). Courts consider the following factors when determining if a police-citizen encounter constitutes a seizure:

> [W]hether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect, and the language and tone of voice of the police.

*United States v. De La Rosa*, 992 F.2d 675, 678 (11th Cir. 1991) (citation omitted).

A police officer seizes a citizen when the officer "by means of physical force or show of authority" restrains that citizen's freedom to move. *Terry v. Ohio,* 392 U.S. 1, 19 n.16 (1968); *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988). The test to determine whether an officer seizes a citizen under the Fourth Amendment asks if "in view of all of the circumstances surrounding the [police-citizen encounter], a reasonable person would have believed that he was not free to leave." *Chesternut*, 486 U.S. at 573 (quotation and citation omitted).

The question here is whether a reasonable person in Mr. Knights's position would believe he was free to leave after Officers Seligman and Samuel parked the patrol car next to the Oldsmobile and approached him.

The facts of this case are similar to those the former Fifth Circuit addressed in

*United States v. Beck*, 602 F.2d 726 (5th Cir. 1979).[5]   In *Beck*, two police officers patrolled a high-crime neighborhood in a marked car when they saw a Chevrolet parked, with two individuals inside, on the side of the road with its engine running. *Id.* at 727.  One of the officers, who claimed to know almost everyone who lived in the neighborhood, did not recognize either occupant in the car, so he parked the patrol car next to the Chevrolet.  *Beck*, 602 F.2d at 727.  The officer originally parked the patrol car so close to the Chevrolet that the officer could not get out to investigate, so the officer pulled forward.  *Id.*  The former Fifth Circuit found that when the officers parked the patrol car next to the Chevrolet, "they clearly took the sort of action contemplated by *Terry v. Ohio*" and its definition of a "stop."  *Id.* at 728 (citations and quotations omitted).  The former Fifth Circuit stated:

> By pulling so close to the Chevrolet, the officers restrained the movement of [the two occupants]; from the record it is readily apparent they were "not free to ignore the officer(s) and proceed on (their) way."

*Id.* at 729 (citations omitted); *see also Childs v. Dekalb Cty.*, 286 F. App'x 687, 695 (11th Cir. 2008) (concluding police officers seized  citizens when, among other things, the officers' car blocked the citizens' car from pulling into a parking space or leaving the parking lot); *United States v. Wright*, No. 3:06CR447/MCR, 2006 WL 3483503, at *3 (N.D. Fla. Nov. 30, 2006) (concluding a police officer seized a citizen when, among other things, the officer parked his patrol car at an angle to the citizen's car with the

---

[5]   The former Fifth Circuit's decisions are binding precedent. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

headlights on).[6]

Similarly here, when Officer Seligman parked the patrol car next to the Oldsmobile in the front yard of a residence, he initiated an investigatory stop (i.e., *Terry* stop) by impeding Mr. Knights's freedom of movement.[7] When Officer Seligman parked the patrol car, Mr. Knights was by the driver's side of the Oldsmobile right next to the patrol car. After Officer Seligmam got out of the patrol car and Officer Samuel walked back toward the Oldsmobile, two uniformed officers with service-issued handguns stood between Mr. Knights and his path to the residence. Mr. Knights then sat down in the driver's seat of the Oldsmobile and closed the driver-side door—behavior that suggests Mr. Knights had no desire to interact with the officers, but the officers still approached him.

When Mr. Knights sat down in the driver's seat, in front of him was a neighbor's mailbox and a large, overgrown shrub. To his right was the white wooden fence surrounding the front of the house. Behind Mr. Knights was the house's mailbox, a large trash receptacle, and part of the patrol car. And to his left was the patrol car parked trunk-to-trunk with the Oldsmobile. Though not impossible, if Mr.

---

[6] *But see United States v. Flores-Uriostegui*, No. 1:01-CR-00438-JEC-LTW, 2012 WL 1884036, at *9 (N.D. Ga. May 22, 2012) (stating that officers arguably needed no reasonable suspicion to park their patrol car in a way that prevented the defendants from moving their parked car).

[7] The undersigned will discuss the characteristics and requirements of a *Terry* stop in Section II(B) below, which concerns whether the officers had reasonable suspicion to seize Mr. Knights.

Knights wanted to drive away, he would have had significant difficulty doing so without hitting the patrol car or an officer.

When Mr. Knights sat in the Oldsmobile, Officer Seligman approached him in uniform, wearing his service-issued handgun, and flashed a flashlight at Mr. Knights. Simultaneously, Officer Samuel, also in uniform and wearing his service-issued handgun, walked back toward the Oldsmobile after failing to speak with Mr. Keaton before he entered the residence where the car was parked. Considering the officers' show of authority, especially Officer Seligman, their locations as they approached the car, and the patrol car impeding Mr. Knights's ability to drive away, no reasonable person in Mr. Knights's position would feel free to leave or disregard the two officers.

The government claims the patrol car did not completely block the Oldsmobile and it was possible for Mr. Knights to drive away. But this argument misses the point. The test is not whether it was possible for Mr. Knights to drive away. The test is, whether under the totality of the circumstances, a reasonable person would believe he was free to leave. *Chesternut*, 486 U.S. at 573 (quotation and citation omitted). The totality of the circumstances in this case establish that a reasonable person would not drive away when an officer parks a patrol car next to the person's vehicle in such a way to make it very difficult to drive away, and then the officer, in uniform and with his service-issued handgun, approaches the person's parked car flashing a flashlight at the car while a second officer also approaches the parked car.

The government also argues no seizure occurred when Officer Seligman parked

12

the patrol car next to the Oldsmobile because Mr. Knights could have walked away like Mr. Keaton.  But Mr. Keaton began walking away from the Oldsmobile and into the residence before Officer Seligman parked the patrol car.  Mr. Keaton did not have to walk past two officers to get into the residence.  Furthermore, before he walked away, Mr. Keaton was on the passenger's side of the Oldsmobile—the side closer to the residence.  In contrast, Mr. Knights was still by the driver's side of the Oldsmobile—the side closer to the patrol car—when Officer Seligman parked the patrol car in close proximity to Mr. Knights.  Had Mr. Knights decided to walk into the residence, he would have had to walk past Officer Seligman, who approached the Oldsmobile, and Officer Samuel, who walked back toward the Oldsmobile.  A reasonable person would not feel free to walk past and disregard two uniformed officers, especially after Officer Samuel failed to speak with Mr. Keaton and the officers parked the restrictive way they did.  Therefore, the government's argument is unavailing.

To support its contention that the encounter did not rise to the level of a *Terry* stop before Officer Seligman smelled marijuana coming from the Oldsmobile, the government points to the following factors: the officers did not retain Mr. Knights's driver's license until Officer Seligman smelled marijuana; the encounter was "extremely brief" before Officer Seligman smelled marijuana; only two officers were present during the encounter; the officers did not display their weapons; and the language and tone used by the officers was "calm and professional."  (Doc. 34, p. 10).

The length of the citizen's detention and questioning, whether the officers displayed their weapons, the number of officers present, and the officers' language and tone of voice are relevant factors when determining if the officers seized a citizen. *De La Rosa*, 992 F.2d at 678. That said, when a police officer parks so close to a citizen's car to impede the citizen's ability to drive away, that action is "clearly the sort of action contemplated by *Terry v. Ohio*." *Beck*, 602 F.2d at 728–29 (citations omitted). As a result, Officers Seligman and Samuel seized Mr. Knights when they parked the patrol car very close to the Oldsmobile, impeded Mr. Knights's ability to drive away, then approached Mr. Knights in the Oldsmobile flashing a flashlight. Therefore, this contention by the government is also unconvincing.

The government argues a police officer does not seize a citizen by approaching that person in a parked car and, for support, cites *Miller v. Harget*, 458 F.3d 1251 (11th Cir. 2006). In *Miller*, the police officer parked a marked patrol car directly behind the suspect's car before getting out and approaching the driver-side window. *Id.* at 1253. The suspect argued the police officer seized him when he parked behind his car. *Id.* at 1257. But the Eleventh Circuit found no seizure when the officer parked behind the suspect's car because the suspect "did not demonstrate that he had any intent to back out of the parking space when [the police officer] pulled up behind him." *Id.* at 1258. Instead, the suspect, who just pulled into a hotel parking lot, informed the officers he intended to get out, walk away from the parked car, and walk into a hotel room. *Id.* at 1257–58.

14

Here, Mr. Knights's actions, before and after Officer Seligman parked the patrol car, demonstrated no clear intent. When the officers drove past the Oldsmobile, they heard someone—presumably Mr. Knights because he was by the driver-side—trying to start the engine. And when Officer Seligman parked the patrol car next to the Oldsmobile, Mr. Knights sat in the driver's seat and closed the door. Therefore, unlike the suspect in *Miller* who demonstrated he had no intent to drive his parked car, it is unclear here whether Mr. Knights intended to drive the Oldsmobile or walk into the residence. Rather, Mr. Knights's attempt to start the Oldsmobile then sit in the driver's seat and close the door suggest he intended to drive away. As a result, *Miller* is inapplicable.[8]

At the suppression hearing, Officer Seligman failed to explain why he parked the patrol car trunk-to-trunk with the Oldsmobile and facing toward oncoming traffic, with the front of the patrol car angled slightly behind the Oldsmobile's rear, impeding the Oldsmobile's ability to drive away. Officer Seligman also acknowledged he could have parked on the right side of the street, where a citizen would park. Had Officer Seligman parked on the right side of the street, the patrol car would have not have

---

[8] To the extent *Miller* applies and conflicts with the former Fifth Circuit's ruling in *Beck*, *Beck* controls. A former Fifth Circuit panel decided *Beck* in 1979; an Eleventh Circuit panel decided *Miller* in 2006. *Beck*, 602 F.2d 726; *Miller*, 458 F.3d 1251. Under the Eleventh Circuit's prior precedent rule, only the Supreme Court or the Eleventh Circuit sitting en banc can overrule a prior panel decision. *Cargill v. Turpin*, 120 F.3d 1366, 1386 (11th Cir. 1997) (citation omitted). Therefore, until the Eleventh Circuit sitting en banc or the Supreme Court holds otherwise, a district court must follow *Beck* to the extent the *Beck* and *Miller* decisions conflict.

15

impeded Mr. Knights's ability to drive away.

Officers Seligman and Samuel seized Mr. Knights when Officer Seligman parked the patrol car next to the Oldsmobile and restrained Mr. Knights's freedom of movement.  Officer Seligman's show of authority after parking the patrol car (flashing his flashlight at Mr. Knights in the Oldsmobile and approaching Mr. Knights in uniform) further establish the officers seized Mr. Knights.  The undersigned will therefore address whether the officers had reasonable suspicion to seize Mr. Knights.

### B.   Officers Seligman and Samuel Had No Reasonable Suspicion of Criminal Activity When They Seized Mr. Knights

Mr. Knights argues Officers Seligman and Samuel seized him without reasonable suspicion.  (Doc. 28, pp. 12–18).  According to Mr. Knights, the following factors were insufficient to provide the officers with reasonable suspicion that Mr. Knights engaged in criminal activity:

> (1) that it was nighttime; (2) that there was a "recent uptick" in violence in the area because of gang activity; (3) that the two men were reaching into the open doors of the car; (4) that Mr. Knights's companion "quickly" walked away; and (5) that Mr. Knights tried to turn on the engine but it would not turn over.

(*Id.* at 15).

Mr. Knights argues the court should give little weight to the time of day and the high-crime factors because these factors are "non-specific" and no connection existed between the gang-activity in the neighborhood and the non-violent burglary the officers believed they saw Messrs. Knights and Keaton committing.  (*Id.* at 16). Mr. Knights also submits the court should give little weight to Messrs. Knights's and

16

Keaton's movements because neither man left the scene in headlong flight, which might have shown "consciousness of guilt" and provided the officers with reasonable suspicion.  (*Id.*).  Similarly, Mr. Knights argues the court should give little weight to the facts that Messrs. Knights and Keaton were leaning into the Oldsmobile and the Oldsmobile would not start.  (*Id.* at 17).  Mr. Knights concludes that the relevant factors the officers considered are insufficient to establish reasonable suspicion that Mr. Knights engaged in criminal activity when the officers approached the Oldsmobile.  (Doc. 28, p. 18).

The government argues the officers had reasonable suspicion to seize Mr. Knights.  (Doc. 34, pp. 12–16).  The government claims that, although the relevant factors Mr. Knights provided "might hold little weight" individually, in combination, the factors establish reasonable suspicion.  (*Id.* at 14–15).

Generally, a police officer must obtain a warrant supported by probable cause to search an individual.  *United States v. Magluta*, 418 F.3d 1166, 1182 (11th Cir. 2005).  But an officer may conduct a *Terry* stop when, in light of his experience, he has reasonable suspicion that an individual may be involved in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 30 (1968).  A *Terry* stop is a brief, warrantless investigatory detention.  *Id.*; *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citation omitted).

To determine if an officer had reasonable suspicion, the court considers the totality of the circumstances.  *United States v. Cortez*, 499 U.S. 411, 418 (1981).  Using the "whole picture," the court determines whether the officer had a "particularized

and objective basis" for stopping the individual.  *Id.*  (citations omitted).  The officer need not be certain the individual is involved in criminal activity.  *Terry*, 392 U.S. at 28.  Instead, the question is whether a reasonably prudent person would be justified in believing his safety, or the safety of others, was in danger.  *Id.*

Reasonable suspicion is a less demanding standard than probable cause. *Wardlow*, 528 U.S. at 123.  That said, reasonable suspicion is more than a hunch and requires a minimal level of objective justification.  *Wardlow*, U.S. at 123–24 (citations omitted).  The officer must draw on his own experience and specialized training to make inferences about the information available to him.  *United States v. Arvizu*, 534 U.S. 266, 274 (2002).  Under *Terry*, a court must first examine whether the officer's original investigation of suspicious circumstances was justified "at its inception."  392 U.S. at 19–20.  Next, a court must determine whether the scope of any search was reasonably related to the circumstances that justified the investigatory detention in the first place.  *Id.* at 20.  With respect to a suppression motion, the government must prove reasonable suspicion existed by a preponderance of the evidence.  *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974) (citation omitted); *Florida v. Royer*, 460 U.S. 491, 500 (1983).

Here, the officers' seizure of Mr. Knights was not justified at its inception because no reasonable suspicion of criminal activity existed.  When driving through a high-crime neighborhood around 1:00 a.m., Officers Seligman and Samuel saw two men leaning into an Oldsmobile parked in front of a residence with its doors open.

18

When the officers drove past the Oldsmobile, the two men gave the officers a "blank stare." Shortly after, the officers heard someone try to start the Oldsmobile, but its engine would not start. When Officer Seligman turned the patrol car around to investigate, Mr. Keaton already began walking toward the front door of the residence where the Oldsmobile was parked. These facts, taken together as a "whole picture," establish no reasonable suspicion of criminal activity by Messrs. Knights and Keaton.

Officers Seligman and Samuel did not see the two men try to pry the Oldsmobile's doors open, pick the locks to the Oldsmobile's doors, or break the Oldsmobile's windows open. The officers also did not see the two men pull property out of the Oldsmobile. Nor did the officers see either man take off in headlong flight (i.e., sprint) once they saw the patrol car. Had the officers observed these types of actions, they may have had sufficient articulable facts to establish the necessary reasonable suspicion (as opposed to just a hunch) that Mr. Knights engaged in criminal activity.

Once again, *Beck* is instructive on this issue. There, the officers claimed they had reasonable suspicion to stop two men in a parked Chevrolet because they were in a high-crime neighborhood, the parked Chevrolet's engine was running, the Chevrolet was parked next to a convenience store, and one of the officers, who claimed to know everyone in that neighborhood, did not recognize either individual in the Chevrolet. *Beck*, 602 F.2d at 729. The former Fifth Circuit concluded these factors were insufficient for the officers to reasonably suspect the two men of criminal

activity.  *Id.*  With respect to the two men in the Chevrolet the officers seized, the former Fifth Circuit stated:

> They were not offending any traffic ordinance; there was no evidence of recent crimes in the neighborhood, no reason to suspect that Beck or his passenger were wanted by the police, and no other reason to believe anything unusual was taking place.

*Id.*; *see also United States v. Alvin*, 701 F. App'x 151, 153–54 (3d Cir. 2017) (concluding no reasonable suspicion existed when officers seized a citizen who made nervous movements by a car parked in a high-crime neighborhood); *United States v. Dell*, 487 F. App'x 440, 446 (10th Cir. 2012) (concluding no reasonable suspicion existed when an officer detained a citizen who looked into the windows of a parked car in a high-crime neighborhood and then walked away from the parked car when he saw the officer's patrol car).

Similarly here, Messrs. Knights and Keaton were not offending any traffic ordinance.  Although Officers Seligman and Samuel previously responded to shootings and narcotics crimes related to gang activity in the area, neither testified they responded to car burglaries or that there had been a recent increase in car burglaries.  Nor did the officers testify that Messrs. Knights's and Keaton's actions were consistent with previous car burglaries they witnessed or responded to in their experience as police officers.  And, put simply, an older car's failure to start is not so unusual that it is reasonable for the officers to jump to the conclusion that the car is being stolen.  Therefore, even taking the facts in the light most favorable to the government, the suspicion that Messrs. Knights and Keaton were in the process of

20

burglarizing the car or stealing the car itself was not reasonable.  To the extent any initial suspicion of criminal activity may have been reasonable, the officers' observation that Mr. Keaton subsequently walked the short distance to the front door of the house where the Oldsmobile was located should have diminished that suspicion before Officer Seligman parked the patrol car to investigate.

Mr. Knights leaning into a car at 1:00 a.m. in a high-crime area, giving a "blank stare" to officers when they drove past in a patrol car, and unsuccessfully trying to start the car did not provide Officers Seligman and Samuel with reasonable suspicion of criminal activity.  Therefore, their seizure of Mr. Knights was unlawful from its inception.

### C.   Evidence and Statements Officers Seligman and Samuel Obtained Were Fruits of an Unlawful Seizure

A court must suppress evidence obtained during an unlawful search, unless the officers obtained the evidence "by means sufficiently distinguishable from the primary taint."  *Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (quotation marks and citation omitted).  When determining if a confession or statement made by a defendant is the result of an unlawful search, courts consider multiple factors, including: (1) the temporal proximity of the arrest and the confession or statement; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the officers' misconduct.  *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975).  *Miranda* warnings alone are not enough to "attenuate the taint of an unconstitutional arrest."  *Id.* at 602.  Nor does a police officer's lack of physical abuse "cure the illegality of an

21

initial arrest." *Taylor v. Alabama*, 457 U.S. 687, 694 (1982).

Here, the physical evidence and statements Officers Seligman and Samuel obtained were the fruits of an unlawful seizure. The officers unlawfully detained Mr. Knights without reasonable suspicion when Officer Seligman parked the patrol car trunk-to-trunk with the Oldsmobile and impeded Mr. Knights's freedom of movement. As a result of that unlawful seizure, Officer Seligman smelled marijuana coming from the Oldsmobile after Mr. Knights rolled down the window to speak with Officer Seligman. The marijuana smell led to Officer Seligman searching Mr. Knights and the Oldsmobile. During his search, Officer Seligman found pill bottles with pills inside, marijuana residue, a firearm, and firearm cartridge. Officer Samuel subsequently found a rifle and another cartridge in the trunk. The officers then read Mr. Knights *Miranda* warnings and obtained a statement. This sequence of events illustrates that no intervening circumstances purged the taint of the officers' unlawful seizure.

Again, *Beck* is instructive and binding. In *Beck*, when police officers unlawfully seized two men in a parked Chevrolet, one of the officers, who got out of the patrol car to speak to the suspects, saw a marijuana cigarette on the ground near the Chevrolet. 602 F.2d at 627. After seeing the marijuana cigarette, the officer arrested the suspect, placed him in the patrol car, and found a syringe and more marijuana in the Chevrolet. *Id.* The officers then told both suspects they were under arrest and read them *Miranda* warnings. *Id.* Despite giving *Miranda* warnings and no

indication of physical abuse by the officers, the former Fifth Circuit found the drugs and paraphernalia obtained were fruits of the unlawful detention. *Id.* at 729.

Similarly here, the evidence and statements obtained by Officers Seligman and Samuel were fruits of an unlawful seizure, despite the calm interaction between the officers and Mr. Knights and despite Officer Seligman giving Mr. Knights *Miranda* warnings. Therefore, all physical evidence and statements Officers Seligman and Samuel obtained should be suppressed.[9]

## III.   CONCLUSION

Officers Seligman and Samuel seized Mr. Knights when Officer Seligman parked the patrol car trunk-to-trunk next to the Oldsmobile and impeded Mr. Knights's freedom of movement. Officer Seligman's show of authority, by approaching Mr. Knights, seated in the Oldsmobile, in uniform and flashing a flashlight at him further establishes Officer Seligman seized Mr. Knights. At the seizure's inception, Officers Seligman and Samuel had no reasonable suspicion Mr. Knights was burglarizing the car, stealing the car itself, or otherwise engaged in criminal activity. Therefore, the physical evidence and statements the officers obtained were fruits of an unlawful detention. Mr. Knights's motion to suppress (Doc. 28) should be **GRANTED**.

---

[9] The government argues the officers had probable cause to search Mr. Knights and the Oldsmobile; therefore, the evidence and statements obtained resulted from a lawful seizure. (Doc. 34, pp. 16–18). However, because the officers lacked reasonable suspicion from the inception of Mr. Knights's unlawful detention, the undersigned need not address this argument predicated on probable cause.

**RECOMMENDED** in Tampa, Florida on this 16th day of July, 2018.

*Amanda Arnold Sansone*

AMANDA ARNOLD SANSONE
United States Magistrate Judge

## **NOTICE TO PARTIES**

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen days from the date of this service shall bar an aggrieved party from attacking the factual findings on appeal. *See* 28 U.S.C. § 636(b)(1).

Copies to: Counsel of Record, District Judge